IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 24-CR-30018 |
| | ) |
| WILLIE B. COLE, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM & ORDER

A grand jury charged Defendant, Willie B Cole, with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (Docs. 1 and 27). Defendant now moves to dismiss the Superseding Indictment, arguing that § 922(g)(1) violates the Second Amendment as applied to him. (Docs. 23).[1] The Government has responded. (Doc. 25). The question before the Court is whether, considering the historical framework set forth in in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), § 922(g)(1) is unconstitutional as applied to Defendant. Since § 922(g)(1) does not so violate the Second Amendment, the Motion is **DENIED**.

    I.    BACKGROUND and ARGUMENT

Count 1 of the Superseding Indictment charges Defendant with Unlawful Possession of a Firearm (a Glock, Model 19 Gen 4, 9mm pistol; on or about May 6, 2023)

---

[1] After Defendant filed his motion to dismiss the Indictment (Doc. 1), the Grand Jury returned a Superseding Indictment (Doc. 27). The Indictment included a single charge for Unlawful Possession of a Firearm in violation of § 922(g)(1). The Superseding Indictment includes a second charge for Unlawful Possession of a Firearm in violation of § 922(g)(1). The arguments raised by Defendant apply equally to the Superseding Indictment, and the Court will construe the motion as seeking to dismiss the Superseding Indictment.

by a Convicted Felon in violation of 18 U.S.Cr § 922(g)(1). (Doc. 27). Count 2 of the Superseding Indictment charges Defendant with Unlawful Possession of a Firearm (a Smith & Wesson, Model Shield, 9mm pistol; on or about September 17, 2024) by a Convicted Felon in violation of 18 U.S.Cr § 922(g)(1). (*Id*.). Defendant contends that his prior felony convictions, Residential Burglary and Aggravated Unlawful Use of a Weapon, are nonviolent convictions. (Doc. 23, pg. 6). Defendant further argues that nonviolent felony offenses do not qualify for federal prosecution under *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022).

The Government counters arguing that the Second Amendment right to bear arms does not extend to felons. (Doc., 25 pgs. 1-6). According to the Government, the Supreme Court "has repeatedly asserted in considered dicta that the Second Amendment does not protect the right of felons to possess firearms." (Doc. 25, pg. 4). Alternatively, the Government contends that Defendant's as-applied challenge fails because his analysis is perfunctory and does not address the analytical framework set forth in the Seventh Circuit's decision in *Atkinson v. Garland,* 70 F.4th 1018 (7th Cir. 2023). Specifically, the Government maintains Defendant "has failed to develop an argument delineating the appropriate legal standards governing his motion or the kinds of evidence that this Court should consider when determining how to resolve his motion." (Doc. 25, pg. 8). As a result, the Government argues, Defendant has waived his as-applied challenge. (*Id*.).

Finally, the Government contends that, even if the Court decides Defendant has preserved his as-applied Second Amendment claim, his motion should be denied under current Second Amendment doctrines.

## II.   DISCUSSION

### A. Supreme Court *Dicta* Does Not Foreclose Defendant's Claim

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear arms, shall not be infringed." U.S. Const. Amend. II. In the last decade or so, much scholarly attention has been paid to the meaning of the words found in the Second Amendment. There is no dearth of recent judicial consideration of both historical and contemporary writings in an effort to understand the import of those words. One such case is *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen* ("*Bruen*"), which articulated a new historical test for determining the scope of the Second Amendment right to possess firearms. As the Supreme Court articulated in *Bruen*, the test is as follows:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id*. at 24 (citing *Konigsberg v. State Bar of California*, 366 U.S. 36, 50 n. 10 (1961)); *see United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024) ("As we explained in *Bruen*, the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition."). Following *Bruen*, courts must ask two questions when considering a Second Amendment challenge. First, whether the plain text of the Second Amendment covers the conduct at issue. Second, if the conduct is

covered, whether the Government can establish that the regulation is consistent with the historical tradition of firearms regulation in the United States. *See Bruen*, 597 U.S. at 24.

Following *Bruen*, there have been "a flurry of filings across the country challenging various firearms regulations," including, as is relevant here, 18 U.S.C. § 922(g)(1). *United States v. Johnson*, 2023 WL 6690388, at *2 (N.D. Ill. Oct. 12, 2023). The overwhelming majority of decisions considering the issue, including decisions by the undersigned, have concluded that § 922(g)(1) remains constitutional after *Bruen*. *See United States v. Calhoun*, 710 F. Supp. 3d 575, 583 n.8 (N.D. Ill. 2024) (collecting cases). Notably, when analyzing challenges to § 922(g)(1), the undersigned has found that the plain text of the Second Amendment covers the conduct at issue, that is, the possession of firearms by a convicted felon. The government disagrees, arguing that Second Amendment protections only extend to law-abiding citizens.

In making this argument, the Government notes that *Bruen*, and related Second Amendment authority, often associate the Second Amendment's protections with "law-abiding" citizens. Additionally, the Government relies heavily on Supreme Court *dicta* emphasizing that the Court's recent Second Amendment opinions should not be interpreted to cast doubt on the longstanding prohibition of the possession of firearms by felons. *See* e.g., *D.C. v. Heller*, 554 U.S. 570, 626-27 (2008) ("nothing in our opinion should be taken to cast doubt on the longstanding prohibitions on the possession of firearms by felons and the mentally ill…"); *McDonald v. City of Chicago*, Ill., 561 U.S. 742, 786 (2010) ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons

4

and the mentally ill…' "); *Bruen*, 597 U.S. at 81 ("Nothing in our opinion should be taken to cast doubt on the longstanding prohibitions on the possession of firearms by felons and the mentally ill…") (Kavanaugh, J. concurring) (internal citations omitted); *United States v. Rahimi*, 144 S.Ct. 1889, 1902 (2024) ("In fact, our opinion stated that many such prohibitions, like those on the possession of firearms by felons and the mentally ill, are presumptively lawful.") (internal citations omitted). According to the Government, this language, which has come to be known as the "*Heller* Safe Harbor," *see, e.g.*, Brannon P. Denning & Glenn H. Reynolds, *Heller, High Water(Mark)? Lower Courts and the New Right to Keep and Bear Arms*, 60 Hastings L.J. 1245, 1247 (2009), reflects the principle that felons are not part of the "people" contemplated in the Second Amendment. (Doc. 25, pgs. 1-3). The Government further argues the *Heller* Safe Harbor is "considered dictum" that "this Court is not free to ignore." (Doc. 25, pg. 4). As such, the Government contends, Defendant's as-applied challenge can and should be dismissed without further analysis.

There is no dispute that the Supreme Court's recent Second Amendment decisions often associate Second Amendment protections with "law-abiding citizens," or that these decisions contain *dicta* emphasizing the prohibition of the possession of firearms by felons is presumably lawful. *See United States v. Rahimi,* 144 S.Ct. 1889 (2024); *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022); *McDonald v. City of Chicago, Ill.*, 561 U.S. 742 (2010); *District of Columbia v. Heller,* 554 U.S. 570 (2008). The Court also acknowledges the Seventh Circuit has stated that absent controlling precedent, considered Supreme Court dictum "provides the best, though not an infallible, guide to what the law is, and it will ordinarily be the duty of a lower court to be guided by it." *Reich v. Cont'l Cas. Co.,* 33 F.3d

5

754 (7th Cir. 1994).[2] The Government, however, is overreading the import of the language on which it relies.

First, the facts of the referenced cases did not give the Supreme Court the opportunity to consider whether convicted felons were part of "the people" contemplated in the Second Amendment. The Court also notes that in *Heller*, the Supreme Court indicated the term "people" as used in the Constitution "unambiguously refers to all members of the political community, not an unspecified subset," and began its analysis with a "strong presumption" that the Second Amendment right "belongs to all Americans." *Heller*, at 580-81. Second, the Seventh Circuit has expressly rejected the notion that the *Heller* safe harbor stands for the proposition that non-law-abiding citizens are excluded from the scope of the Second Amendment:

> We do not think it profitable to parse these passages of *Heller* as if they contained an answer to the question whether § 922(g)(9) is valid. They are precautionary language. Instead of resolving questions such as the one we must confront, the Justices have told us that the matters have been left open. The language we have quoted warns readers not to treat Heller as containing broader holdings than the Court set out to establish: that the Second Amendment creates individual rights, one of which is keeping operable handguns at home for self-defense. What other entitlements the Second Amendment creates, and what regulations legislatures may establish, were left open. The opinion is not a comprehensive code; it is just an explanation for the Court's disposition. Judicial opinions must not be confused with statutes, and general expressions must be read in light of the subject under consideration.

---

[2] *But C.F. Andrew v. White,* No. 23-6573, 2025 WL 247502, at *5 (U.S. Jan. 21, 2025) (Thomas & Gorsuch, JJ., dissenting) ("We have instructed lower courts to avoid framing our precedents at too high a level of generality; to carefully distinguish holdings from dicta; and to refrain from treating reserved questions as though they have already been answered.").

*United States v. Skoien,* 614 F.3d 638, 640 (7th Cir. 2010). *See also Kanter v. Barr*, 919 F.3d 437, 445 (7th Cir. 2019) (the [Supreme Court] "never actually addressed the historical pedigree of felon dispossession laws. Accordingly, we have refused to read too much into the Court's 'precautionary language.'"); *Atkinson v. Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023) (declining invitation to forego *Bruen* analysis "based on oft-quoted *dicta* describing felon-in-possession laws as 'presumptively lawful'"). For these reasons, the Court rejects the Government's contention regarding *dicta* in *Heller* and its progeny and proceeds with application of *Bruen's* historical analysis to Defendant's as-applied challenge.

### B. The Text of the Second Amendment to the Constitution

The Court finds Defendant is a person included within the term "people," as used in the Second Amendment. The phrase "the people" is used in notable places in the Constitution, and it "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *See District of Columbia v. Heller*, 554 U.S. 570, 580 (2008) (quoting *U.S. v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). As was emphasized in *Heller,* in all six other provisions of the Constitution mentioning "the people," the term unambiguously refers to all members of the political community, not an unspecified subset. *Id.* Accordingly, there is a "strong presumption that the Second Amendment right is exercised individually *and belongs to all Americans.*" *Id.* at 581 (Emphasis added.); *see also U.S. v. Ball*, No. 22-cr-449, 2023 WL 8433981, *6 (N.D. Ill. Dec. 5, 2023) ("[N]either *Heller* nor *Bruen* involved the issue of felons, much less the issue of the Second Amendment's textual scope as it applies to felons. So, while the Supreme Court in both

7

cases referred to law-abiding citizens in discussing the Second Amendment's scope, it did not *hold* in either case that 'the people' was limited to law-abiding people.") (Emphasis in original.). The record reflects that Defendant is an American citizen and, therefore, that he is to be afforded the rights available under the Second Amendment, despite his status as a felon. *See Ball*, 2023 WL 8433981 at *7 (concluding that felons are not categorically excluded from the plain textual scope of the Second Amendment).

Further, there appears to be no dispute that the term "arms," as used in the Second Amendment, includes the pistols, allegedly found in Defendant's possession on May 6, 2023 and September 17, 2024. (Doc. 27). The 18th Century meaning of "arms" is no different than the meaning today. *See Heller*, 554 U.S. at 581. An "important" legal dictionary from 1771 defined "arms" as "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *Id.* (quoting 1 A New and Complete Law Dictionary; citing N. Webster, American Dictionary of the English Language (1828) (reprinted 1989)). Handheld firearms date back to as early as the 17th Century and were common during the years of ratification. Clearly, the pistols at issue fit within the term "arms," as used in the Second Amendment, and the Government does not argue otherwise here. *See id.* at 582 ("Just as the First Amendment protects modern forms of communications…and the Fourth Amendment applies to modern forms of search…the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."). It follows, then, that the Second Amendment presumptively protects the activity of possessing a pistol, and that finding is consistent with *Heller*.

However, § 922(g)(1) excludes from that protected activity those who have been convicted of a crime punishable by more than one year of imprisonment. *See* 18 U.S.C. § 922(g)(1). The potential problem for § 922(g)(1) lies in the fact that its regulation of the Second Amendment right began nearly 200 years after ratification. *See Bruen*, 597 U.S. at 19 (" '[P]ost-ratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text.' ") (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1274 n. 6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting)). Accordingly, the Government must "demonstrate[e] that it is consistent with the Nation's historical tradition of firearm regulation," and "[o]nly then may [the] court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " *Id.* at 24. (citing *Konigsberg,* 366 U.S. at 50 n. 10).

### C. *Bruen's* **Historical Analysis for Justifying the Regulation of Second Amendment Activities**

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. Amend. II. Importantly, "[t]here seems…no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms. Of course the right was not unlimited." *Heller*, 554 U.S. at 595. As alluded to above, whether a regulation interferes with that individual right "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Bruen*, 597 U.S. at 26. *Bruen* teaches:

> When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy….

9

> Like all analogical reasoning, determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are "relevantly similar."

*See id.* at 28-29 (citing C. Sunstein, On Analogical Reasoning, 106 Harv. L. Rev. 741, 773 (1993)).

Recently, in *United States v. Rahimi*, 144 S. Ct. 1889 (2024), the Supreme Court considered the constitutionality of 18 U.S.C. § 922(g)(8)(C)(i), which disarms persons against whom a court has issued a restraining order and has found that the person poses "a credible threat to the physical safety" of a protected person. 144 S. Ct. at 1898-99. Applying *Bruen's* historical analysis, the Court upheld the constitutionality of 922(g)(8)(C)(i), and in so doing, clarified the test for assessing Second Amendment challenges, stating:

> [S]ome courts have misunderstood the methodology of our recent Second Amendment cases. These precedents were not meant to suggest a law trapped in amber.... [T]he Second Amendment permits more than just those regulations identical to ones that could be found in 1791. Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers.... [T]he appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition. A court must ascertain whether the new law is relevantly similar to laws that our tradition is understood to permit, applying faithfully the balance struck by the founding generation to modern circumstances.... Why and how the regulation burdens the right are central to this inquiry. For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations. Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding. And when a challenged regulation does not precisely match its historical precursors, it still may be analogous enough to pass constitutional muster. The law must comport with the principles underlying the Second Amendment, but it need not be a "dead ringer" or a "historical twin."

*Id.* at 1897-98 (quotations and citations omitted).

Under this legal framework, historical sources must be sifted through and examined in the search to find reliable indicia of our forefathers' most probable intellectual reactions to the modern regulation or law in question. This process necessarily entails a quarry of analogous, but not entirely identical, legislative artifacts that help to determine the scope of the right, as understood by those who adopted the Amendment. The undersigned recently issued opinions conducting such a historical analysis in the context of similar § 922(g)(1) challenges. *See United States v. Sloat*, 705 F. Supp. 3d 862 (S.D. Ill. 2023); *United States v. Perkins,* 709 F. Supp. 3d 610 (S.D. Ill. 2023); *United States v. Clubb*, No. 3:23-CR-30099-DWD, 2024 WL 167676 (S.D. Ill. Jan. 16, 2024); *United States v. Wiley*, 718 F. Supp. 3d 888 (S.D. Ill. 2024), appeal dismissed, No. 24-1421, 2024 WL 4212901 (7th Cir. Apr. 11, 2024); *United States v. Pierce*, No. 3:23-CR-30046-DWD, 2024 WL 1554835 (S.D. Ill. Apr. 10, 2024). In each opinion, this Court held that the history of the right to keep and bear arms—before, during, and after the Founding Era—provides a sufficient historical tradition to support enforcement of § 922(g)(1). *See* e.g., *United States v. Perkins*, 709 F. Supp. 3d 610, 618 (S.D. Ill. 2023) ("There are ample 'distinctly similar' historical exemplars and models demonstrating individually, and certainly collectively, that regulations disarming disloyal, dangerous, or merely untrustworthy individuals were not uncommon in the early history of our Country.").

Defendant contends § 922(g)(1) is unconstitutional as applied to him because his criminal history involves only nonviolent misdemeanor and felony convictions. The

11

Government contends Defendant's argument should be denied as perfunctory because it fails to apply the analytical framework set forth in *Atkinson v. Garland,* 70 F.4th 1018 (7th Cir. 2023).

In *Atkinson*, a civil litigant with a 24-year old conviction for mail fraud brought an as-applied constitutional challenge to § 922(g)(1). Because the district court dismissed his complaint before the Supreme Court articulated its historical analysis test in *Bruen*, the Seventh Circuit remanded the case "to allow the district court to undertake the *Bruen* analysis in the first instance." *Id.* at 1022. In remanding the case, the Seventh Circuit identified a series of questions intended to "help focus the proper analysis on remand." *Id.* at 1023. In particular, the Government faults Defendant for failing to present historical evidence to justify different outcomes for violent and non-violent crimes – the fifth factor identified in *Atkinson*.

The Court agrees. Like the defendant in *Atkinson*, Defendant does not provide the Court with a "historical basis for individualized assessments" or carveouts between "individuals who committed violent versus nonviolent crimes" for 922(g)(1) purposes. Without such an analysis, and considering the historical evidence reviewed by the Court, the Court concludes there is no basis for an individualized assessment based on dangerousness. In fact, as outlined in the Government's briefing and as discussed in this Court's prior opinions, history is replete with representative analogues establishing a historic principle of disarming individuals for non-violent offenses. *See* e.g. *United States v. Pierce*, No. 3:23-CR-30046-DWD, 2024 WL 1554835 (S.D. Ill. Apr. 10, 2024) (identifying numerous historical exemplars demonstrating a history of disarming individuals

perceived or deemed to be disloyal, untrustworthy, or criminal, as well as a history of disarming individuals who committed non-violent offenses). *See also United States v. Young,* 2023 WL 8697936, at *2–3 (N.D. Ind. Dec. 15, 2023) ("[T]he historical record shows strong support for the ability to categorically prohibit a defined group from possessing arms based on the legislature's assessment the group was dangerous or untrustworthy, without individual dangerousness assessments of group members.").

Further, even if historical tradition supported disarming only "dangerous" or "violent" individuals (which the Court does not find), Defendant's criminal history, which includes felony convictions for Residential Burglary and Aggravated Unlawful Use of a Weapon, more than supports a finding of dangerousness. As argued by the Government, these convictions demonstrate "the risk Defendant poses to public safety, his disregard for the law, and society's inability to trust that he will use a weapon responsibly." (Doc. 25, pg. 54).

The Court rejects Defendant's contention that because burglary is not a "crime of violence" under the Armed Career Criminal Act, it cannot be considered a dangerous offense. As noted by the Government, "crime of violence" is a term of art that does not necessarily align with dangerousness. *See United States v. Taylor*, 596 U.S. 845, 867 (2022) (Thomas, J., dissenting) ("In case after case, [categorical approach] precedents have compelled courts to hold that heinous crimes are not 'crimes of violence' just because someone, somewhere, might commit that crime without using force."). Thus, whether an offense is deemed a "crime of violence" is not particularly persuasive. The Court, however, is persuaded by the Supreme Court's stance on the issue. The Supreme has

13

stated that burglary "is dangerous because it 'creates the possibility of a violent confrontation between the offender and occupant, caretaker, or some other person who comes to investigate.'" *Quarles v. United States*, 587 U.S. 645, 653, 139 S. Ct. 1872, 1879, 204 L. Ed. 2d 200 (2019) (citing *Taylor v. United States*, 495 U.S. 575, 588, 110 S. Ct. 2143, 2153, 109 L. Ed. 2d 607 (1990)). The fact that Defendant was involved in a residential burglary, an offense that has potential for serious violence, is sufficient, for purposes of § 922(g)(1), to support a finding of dangerousness.

Thus, incorporating the Court's prior reasoning rejecting similar § 922(g)(1) challenges, and applying the legal framework set forth in recent Second Amendment decisions from the United States Supreme Court and the Seventh Circuit Court of Appeals, the Court finds that § 922(g)(1) is part of the Nation's historical tradition of delimiting the outer bounds of the right to keep and bear arms under the Second Amendment, such that it is not unconstitutional as applied to Defendant – an individual who's underlying convictions include Residential Burglary and Aggravated Unlawful Use of a Weapon.

## III.  CONCLUSION

For the reasons explained above, the Court **FINDS** § 922(g)(1) does not violate the Second Amendment as applied to Defendant. Accordingly, the Motions to Dismiss the Indictment (Doc. 23) is **DENIED**.

**SO ORDERED.**

Dated: January 27, 2025

s/ *David W. Dugan*
_____
DAVID W. DUGAN
United States District Judge
